United States Court of Appeals,

Eleventh Circuit.

No. 97-6256.

Charles L. CARTER, Plaintiff-Appellant,

v.

THREE SPRINGS RESIDENTIAL TREATMENT, Defendant-Appellee.

Jan. 6, 1998.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV 95-HM-2325-NW), E. B. Haltom, Jr., Judge.

Before HATCHETT, Chief Judge, and FAY and FARRIS[*], Senior Circuit Judges.

FAY, Senior Circuit Judge:

Plaintiff-Appellant Charles L. Carter, a black male, brought this Title VII action against his employer, Defendant-Appellee Three Springs Residential Treatment ("Three Springs"), alleging that Three Springs' decision to promote Greg Haynes, a white male, to the position of Program Director at its Courtland, Alabama facility was motivated by unlawful racial discrimination. After the close of discovery, the district court entered summary judgment for Three Springs, finding that Carter failed to produce either direct evidence of racial discrimination, or circumstantial evidence in satisfaction of the elements of a prima facie case of disparate treatment as set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Because we find that the evidence in this record, when viewed in the light most favorable to Carter, satisfies the *McDonnell Douglas* elements and could be found to cast doubt on the legitimacy of Three Springs' reasons for not promoting Carter, we reverse the entry of summary judgment and remand for trial.

[*]Honorable Jerome Farris, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

## I. FACTS

A. *Background*

Three Springs' facility in Courtland, Alabama (the "Courtland facility"), which opened in 1990, specializes in the treatment of young males with histories of sexual crimes or other serious mental health problems. The population of the Courtland facility tends to be very aggressive, consisting of children and young adults who can be sociopathic in nature and have great difficulty telling right from wrong. The Courtland facility addresses these problems through psychotropic medicine, psychological counseling, and educational services.

To deliver this care, the Courtland facility has a large staff, much of which is under the supervision of the facility's Program Director. According to the published job description, the Program Director "is responsible for the sound management and effective service of all clinical departments. This position coordinates the clinical services of the facility to maximize effectiveness and eliminate duplication of effort." The departments supervised by the Program Director include Family Services, Educational Services, Admissions, Administration, and Nursing. The Assistant Director of Nursing supervises the various categories of Counselors at the facility, including the positions occupied by Carter during his tenure as a Three Springs employee. The Program Director's direct supervisor is the facility's Administrator. At the time that Carter was considered for promotion to the position of Program Director, the Administrator was Dr. Pam Cook. It is uncontested that the decision not to promote Carter was made by Cook and her immediate supervisor, Beverly McLemore, Three Springs' Director of Operations.

Carter applied for a position at the Courtland facility in September 1990 at the age of 57. He had retired about a year earlier from a long career as an educator in Alabama public schools. In 1956, Carter had his first job as a coach and teacher at Cherokee High School in Colbert County,

Alabama. After just four years, he was hired to be principal of the Webster School in Muscle Shoals, Alabama. In 1967, the Webster School was closed and turned into a Head Start Center, a pre-school for underprivileged children. Carter stayed on as a teacher until 1971.

In 1971, Carter was hired as a physical education teacher at Avalon Middle School and Muscle Shoals High School. In 1972 he became principal of Avalon Middle School, in part by order of the old Fifth Circuit.[1] The school board fired Carter for insubordination in 1977. He sued and was denied relief in an order affirmed by this court.[2] After a brief hiatus, he was hired by his alma mater, Alabama State University, to teach education administration in the graduate school of education. In 1978, he left the university to become a project director for the National Employment Service, a program funded by the Department of Labor and charged with helping the unemployed find work. After the program lost its funding, Carter worked briefly for an attorney helping him to prepare racial discrimination lawsuits. In 1982, he returned to public education as principal of Bullock County High School. After six years on the job, he retired in 1988.

In addition to his job experience, Carter also boasted a bachelor's degree from Alabama State University in Physical Education and History received in 1956, and a master's degree from Indiana University in Educational Administration-Guidance received in 1966. He continued to take courses in the field of educational administration at the University of Alabama until 1978.

Carter was hired to be a Counselor Aide at the Courtland facility after interviewing with McLemore in September 1990. Carter testified in his deposition that, as a Counselor Aide, his job

---

[1] The Webster School was closed as a result of a desegregation order. Carter argued, and the Fifth Circuit agreed, that the school district was obliged to fill administrative positions in new schools with displaced administrators from the closed schools. *See Lee v. Macon County Bd. of Educ.,* 453 F.2d 1104 (5th Cir.1971).

[2] *Carter v. Muscle Shoals Bd. of Educ.,* No. 81-7247, 669 F.2d 735 (11th Cir. Feb. 5, 1982).

was to man a post and check in with his supervisor for the assignment of various tasks. These tasks included talking with students, going for walks with them, playing sports with them, and "counsel[ing] with them." Carter described these counseling sessions: "Well, some children come from Georgia or someplace, and they needed a—just to talk. They needed to tell you about their problems. And you just mainly—sometimes you'd just listen. And if they asked you a question, you'd try to help him solve it." Carter testified that he would report his conversations with students to psychiatrists and social workers.

Carter served as Counselor Aide until January 1991 when he was promoted by McLemore and Cook to the position of Counselor I. Carter testified that he asked Cook and McLemore for the promotion and received it after "[s]omebody got fired or quit." Carter described his responsibilities as Counselor I:

> My job duties as a counselor was to again do the one-to-one counseling, teach counselors—teach Life Skills at night one day a week—or two days a week, two days a week, and supervise the group when I go to lunch, supervise them on the playground, supervise them in the hall, and in the mornings, wake them up, see to it that everybody took a bath and get ready for breakfast at 6:00, and whatever I was told—whatever else I was told to do.

Three Springs' official job description for the position of Counselor I was, "Provides direct service delivery to resident population and assures quality documentation in resident medical report."

In September of 1992, Carter was made a shift supervisor by Cook with supervisory responsibility over other counselors. Although he was considered for vacancies in the position of Program Director in late 1992 and early 1993, he was not promoted. In May of 1993 Carter was again promoted to the position of Counselor II. The job description for the position of Counselor II is identical to that of Counselor I. Later, in 1993, he was again considered for the position of Program Director, but the position never became vacant.

In general, Carter's performance as a Counselor received high marks from his supervisors,

and the general quality of his work as a counselor is not disputed by Three Springs. He received one oral reprimand for his involvement in an incident where two residents escaped from the facility. On another occasion he was informed that he needed to improve the quality of his written reports.

B. *The Employment Decisions at Issue*

The controversy in this case revolves around Three Springs' efforts, once in 1992 and twice in 1993, to fill the position of Program Director. Carter testified in deposition that as early as 1990 he made his interest in the position clear to Cook and McLemore, and they do not dispute that he was considered for the promotion on at least three different occasions.

Three Springs had written policies that pertain to the process of filling the position. First, Three Springs had the policy that "[a]ll open positions will be announced internally by posting the position on the staff bulletin board in order for employees to be aware of, and apply for, positions for which they are qualified." Second, "[i]f more than one staff member qualifies for the same position, the promotion decision will be based upon (in this order): 1) job performance in existing role; 2) seniority within the job classification; 3) seniority within the organization." Last, Three Springs had a written job description for the position of Program Director that included a list of the "position requirements":

> EDUCATION: Master's degree from an accredited college or university in mental health-related clinical field, or administrative field, or Ph.D. in clinical or administrative area.
>
> EXPERIENCE: Three to five years of clinical experience with prior administrative experience in a psychiatric in-patient setting. Licensure or certification by appropriate state body if applicable to educational degree. Prior experience in facility which meets JCAHO and Medicare standards desired.
>
> SPECIAL KNOWLEDGE AND SKILLS: 1) Exceptional verbal and written skills are required to effectively express ideas and views when (a) speaking to groups, medical staff, clinical personnel, and administrator; (b) for preparing written reports in technical language; for (c) clarify [sic] in supervising and delegating responsibility to department heads. 2) Ability to evaluate and utilize data from statistical reports, budgets, descriptions of

programs.  3) Must possess initiative and judgement capabilities to organize and plan activities, formulate policies, delegate responsibility, to organize and plan activities, formulate policies, delegate responsibility [sic], systematize procedures, promote favorable public relations and make decisions affecting service delivery to patients.  4) Must be capable of relating to people in a manner to win confidence and establish support.  Must be flexible to adjust to changing conditions and the various details of the job.

The first vacancy arose in November 1992 when Cook was promoted from the position of Program Director to become the facility's Administrator.  The record is not clear as to whether the vacancy was announced internally as required by Three Springs' policy.[3]  Cook and McLemore testified in deposition that, at that time, they individually compiled "mental lists" of employees involved in direct patient care who met the educational requirement for the position.  According to the official job description, the position required a "Master's degree from an accredited college or university in mental health-related clinical field, or Ph.D. in clinical or administrative area."

Cook and McLemore testified that they individually reviewed the personnel files of all direct care employees who met the education requirement, a list that included Carter and Brenda Baird, then the Director of Family Services, and Greg Haynes, then the Director of Educational Services. They testified that they reviewed each file without consideration of the employee's demonstrated interest in the position.  After reviewing the files, they both determined that Baird, a white female, was the most qualified individual.  Cook then informally interviewed Baird and gave her the promotion.[4]

Baird stayed in the position for a very short time, and the position was again vacant in early 1993.  Cook and McLemore failed to comply with company policy and did not internally announce

---

[3]Cook and McLemore testified in deposition that they did not remember posting the vacancy, but Carter testified that he thought he remembered seeing an announcement.

[4]Carter does not allege that the selection of Baird constituted discrimination because he concedes that Baird was more qualified for the promotion.

the vacancy. They again reviewed the personnel files of all employees with the appropriate educational credentials, including Carter and Haynes. Haynes, a white male and then the Director of Education, joined the Courtland facility in August 1992. Before that, he worked at the C.I.T.Y. program in Tuscaloosa, Alabama, a program designed to intervene in the lives of juvenile criminals. At the Courtland facility, he assisted in the treatment of adolescent sexual disorders and helped the facility to meet various federal and state standards.

Cook stated in her affidavit that she and McLemore reviewed the personnel files of people who met the education requirement to determine if they met the other job requirements of experience, and special knowledge and skills. According to McLemore and Cook, neither Haynes nor Carter met the experience requirement. Nonetheless, they agreed that Haynes was the most qualified person for the job, informally interviewed him, and hired him. The entire process took two days.

Later in 1993, Haynes announced that he intended to transfer to a different Three Springs facility. This time, Cook and McLemore posted an announcement of the expected vacancy both internally and externally. In response, they received applications from two internal applicants including Carter. Cook and McLemore interviewed Carter. McLemore stated that she was not impressed with Carter's interview. In any event, Haynes decided not to leave the Courtland facility, and the position never became vacant.

C. *Procedural History*

Carter filed this action on September 11, 1995, alleging violations of both the Age Discrimination in Employment Act, 29 U.S.C. § 6001, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Carter subsequently dropped his age discrimination claim. After the close of discovery, Three Springs moved for summary judgment.

Carter's theory of liability under Title VII was that the decision to promote Haynes to fill the second vacancy of the position of Program Director was motivated by the desire to promote a white employee instead of a black employee. In support of this theory, Carter offered affidavits containing statements by Cook, allegedly constituting direct evidence of Three Springs' discrimination. In support of his circumstantial evidence theory, Carter argued to the district court that the evidence in the summary judgment record indicated that he was qualified for the promotion and that Haynes was not better qualified. Furthermore, Carter argued that Three Springs' failure to adhere to its own policies with regard to filling vacant positions contributed to a possible inference of discrimination. Finally, Carter submitted ten affidavits of black former employees of the Courtland facility who recounted instances of disparate treatment while on the job as circumstantial evidence that he was passed over for promotion because of his race.

The district court struck most of the content of the affidavits submitted by Carter from the summary judgment record on various grounds such as relevance, inadmissable hearsay, and lack of personal knowledge. On February 12, 1997, the district court entered summary judgment for Three Springs. The district court found that no inference of discrimination could arise from the facts in the summary judgment record because Carter had not shown that he was qualified to be Program Director. Carter filed notice of appeal on March 14, 1997, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

We review the granting of a motion for summary judgment *de novo,* using the same legal standard as the district court. *See Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1374 (11th Cir.1996). Summary judgment is proper if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).  In reviewing the record, we are mindful that the evidence must be viewed in the light most favorable to the nonmoving party.  *See Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau,* 835 F.2d 855, 856 (11th Cir.1988).

### III. DISCUSSION

The issue in this case is whether Carter carried his burden of producing evidence sufficient to create a genuine issue as to a material fact on his disparate treatment claim.  A plaintiff can carry this burden by producing direct evidence of discrimination motivating the employment decision at issue, or by producing circumstantial evidence sufficient to allow an *inference* of discrimination. *See Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773-74 (11th Cir.1982).  Whether evidence is characterized as "direct" or "circumstantial" dramatically affects the allocation of the evidentiary burdens;  therefore, we discuss the two types of evidence separately to determine whether summary judgment was appropriate.

A. *Direct Evidence*

Carter argues that the trial court erred in granting summary judgment because he presented direct evidence that Three Springs failed to promote him because of his race.  If Carter is right, then summary judgment was inappropriate and the burden of persuasion at trial should have shifted to Three Springs to prove by a preponderance of the evidence that it would have made the same decision even if it had not used race as a criteria in its decision to promote Haynes instead of Carter. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 276-77, 109 S.Ct. 1775, 1804-05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring);  *Haynes v. W.C. Caye & Co., Inc.,* 52 F.3d 928, 931 n. 8 (11th Cir.1995) (adopting Justice O'Connor's burden of proof analysis).

We have defined direct evidence as " "evidence, which if believed, proves existence of fact

in issue without inference or presumption.' " *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997), *quoting Rollins v. TechSouth Inc.,* 833 F.2d 1525, 1528 n. 6 (11th Cir.1987). "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir.1990). *See, e.g., E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 923 (11th Cir.1990) (production manager's statements to black employee that "you people can't do a _____ thing right" constituted direct evidence); *E.E.O.C. v. Beverage Canners, Inc.,* 897 F.2d 1067, 1072 (11th Cir.1990) (overwhelming amount of evidence of racial hostility, including barrage of racial slurs, was direct evidence); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 876 (11th Cir.1985) (statement by plant manager that he wouldn't hire blacks because "half of them weren't worth a shit" was direct evidence).

The only evidence that could possibly be described as "direct" is found in the affidavits of former Three Springs employees offered into evidence by Carter in opposition to Three Springs' motion for summary judgment.[5] Most of the affiants' statements contain conclusory and generalized allegations of racial bias, much of which was properly struck by the district court.[6] But the affidavit of Margarett Allen, former Education Director at Three Springs, relates a conversation between her and Cook:

---

[5]Carter also argues in his briefs that statistical evidence in the record should be considered direct evidence of discrimination allowing him to overcome his burden of production. Specifically, he cites the fact that Three Springs has never hired a black Program Director. Our cases are clear, however, that "statistics alone cannot make a case of individual disparate treatment." *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1131 (11th Cir.1984) (distinguishing individual cases from class action cases where statistics, if strong enough, can carry the plaintiff class's initial burden of production).

[6]For example, statements by affiants that the Courtland facility "was a racially hostile environment," or that "there was a racially biased attitude by management towards minority black employees," were properly struck as conclusory.

During the time I worked at Three Springs, I reported directly to Pam Cook, who was then Program Director. Pam Cook admitted to me that she had difficulty in understanding Afro-Americans, and that further, her experience and interaction up to this time had been minimal with respect to black employees, and that Ms. Cook identified a bias against blacks and she found that they were difficult for her to trust or get along with.

The district court struck this portion of Allen's affidavit on the grounds that it is inadmissable hearsay. Carter argues that the statement by Cook in which she "identified a bias" constitutes an admission by the agent of a party-opponent and is "not hearsay" under Federal Rule of Evidence 801(d)(2).

We need not decide the evidentiary issue, however, because even if admissible, the statement does not amount to direct evidence. First, the statement as recorded in the affidavit is susceptible to more than one interpretation. Cook, in explaining her bias to a black colleague, could have been expressing a desire to get past such prejudices. We have held that statements that are open to more than one interpretation do not constitute direct evidence of racial discrimination. *See Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1083 n. 2 (11th Cir.1996). Second, the statement does not relate directly to the decision to promote Carter to the position of Program Director. To say that Cook "identified a bias" to Allen is not the same as saying that Cook exercised that bias in the case of Carter's promotion. Direct evidence, by definition, is evidence that does not require such an inferential leap between fact and conclusion. *See Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081-82 (11th Cir.1990) (evidence merely suggesting discrimination is not enough).

B. *Circumstantial Evidence*

Carter claims that he produced circumstantial evidence that could allow a reasonable trier of fact to infer that Three Springs' decision not to promote him was racially motivated. In evaluating the evidence in the record, we are guided by the evidentiary framework announced in *McDonnell Douglas,* and its progeny. The plaintiff bears the initial burden of producing circumstantial evidence

of racial discrimination and establishing a prima facie case. Under *McDonnell Douglas,* a plaintiff can satisfy this burden by proving that (1) the plaintiff is a member of a protected minority group; (2) the plaintiff was qualified for and applied for the promotion; (3) the plaintiff was rejected in spite of his qualifications; and (4) the individual who received the promotion is not a member of a protected group and had lesser or equal qualifications. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Wu v. Thomas,* 847 F.2d 1480, 1483 (11th Cir.1988). The establishment of the *McDonnell Douglas* elements is significant for two reasons: first, it creates a presumption of unlawful discrimination that the employer must rebut or lose as a matter of law; and, second, it means that the plaintiff has presented evidence allowing a reasonable trier of fact to infer unlawful discrimination. The burden then shifts to the employer to articulate legitimate nondiscriminatory reasons for the failure to promote. Successfully carrying this burden bursts the presumption of discrimination and leaves only the ultimate question—whether the employer's offered explanations are pretextual. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997).

## 1. Prima Facie Case

Three Springs does not dispute that Carter is black, was considered for the promotion, and was rejected. They argued, and the district court agreed, that Carter was neither minimally qualified for the position of Program Director nor as qualified as Haynes for the promotion.

Initially, we must determine the minimum qualifications for the job of Program Director. It is clear from the testimony of Cook and McLemore, that of the three "position requirements" of education, experience, and special knowledge and skills, only education was treated as a minimum requirement. Both Cook and McLemore testified in their depositions that they considered education

to be the minimum requirement that assisted them in initially selecting a pool of candidates to consider for the position. Furthermore, McLemore conceded that although Haynes and Baird were both hired for the position, neither possessed the required years of "clinical experience." Therefore, clinical experience cannot be considered to be a minimum qualification. Carter received his master's degree in 1966 from Indiana University in educational administration, meeting the education requirement and the "minimum qualification" for the position.

Even if Carter was minimally qualified for the position, Three Springs argues that he was less qualified than Haynes for the job. Considering the other two criteria—experience and special knowledge and skills—a reasonable trier of fact could find that Carter was equally qualified for the position. Carter argues, for example, that in his time as a Counselor at the Courtland facility and in his time as a public school teacher and administrator, he amassed more than the three to five years of "clinical experience" listed as a job requirement while it is uncontested that Haynes did not. McLemore testified that "clinical" in the job description referred to the "ability to make judgments and recognize impaired behaviors and to intervene in that process." Such activities were arguably in Carter's job description as a Counselor at the Courtland facility, and he was arguably called upon to "make judgments" about "impaired behaviors" as a public school teacher and principal.[7] Three Springs argues that such experience is not relevant to the position of Program Director because it took place amongst a "normal population." However, we will not add to the objective requirements found in the Program Director job description, especially considering our procedural posture.

Three Springs also argues that Carter did not have "administrative experience in a psychiatric in-patient setting," while Haynes clearly did in his position at the Courtland facility. Although Three

---

[7]Both Cook and McLemore conceded that they did not investigate Carter's experience as a public school teacher and principal to determine if it constituted "clinical experience."

Springs argues to the contrary, this description may very aptly describe Carter's job as a Counselor at the Courtland facility. In addition to following instructions given by his supervisors, Carter was responsible for filling out reports and supervising other Counselors as a shift supervisor. The drafters of the job description may have intended something more, but shoddy drafting does not give an employer license to redefine job requirements on the fly in an attempt to win summary judgment. Three Springs can argue to the trier of fact that "administrative experience" means something more than the experience that Carter gained in his tenure at the Courtland facility.

Finally, Three Springs argues that Carter does not possess the requisite "special knowledge and skills" to be Program Director. Cook and McLemore testified that Carter did not possess "exceptional verbal and written skills" or the ability to "prepar[e] written reports in technical language," but there is little objective evidence in the record to support their conclusion. On one occasion, Cook testified that she expressed concerns about Carter's written notes in an annual evaluation. On the other hand, in Margarett Allen's affidavit, she makes the following statement: "I also noted that Mr. Carter adequately handled the vocabulary that was necessary in order to interact with other employees."[8] Annie M. Cobb, at one time Carter's supervisor at the Courtland facility, made the following statement in her affidavit: "He provided good written documentation for his position."[9] Viewed in the light most favorable to Carter, the evidence supports a conclusion that his written skills, and his technical knowledge, were on par with those of Greg Haynes.

As to the other "special knowledge and skills," they are too subjective to allow for any

---

[8] The district court struck this portion of Allen's affidavit on the ground that is was not relevant to the case. Because, in her capacity as Director of Education, she was in a position to form an opinion as to Carter's ability to use the relevant vocabulary, and because that opinion is relevant to the issue of Carter's qualifications, it should not have been stricken.

[9] This sentence also should not have been stricken. As Carter's supervisor, Cobb had personal knowledge of his written work, and her opinion is relevant to the issue of his qualifications.

meaningful comparison between Carter and Haynes. While there is nothing inherently wrong with allowing decision makers to base decisions on subjective criteria, we have found that "subjective evaluations involving white supervisors provide a ready mechanism for racial discrimination." *Miles,* 750 F.2d at 871. For example, requirements such as the possession of "initiative and judgement capabilities" and the ability "to relate to people in a manner to win confidence and establish support" are incapable of objective evaluation. They cannot be relied upon by an employer seeking to defeat the plaintiff's prima facie case by showing that the plaintiff is less qualified than the applicant chosen for the promotion.

## 2. Three Springs' Rebuttal

As legitimate reasons for its failure to promote Carter, Three Springs repeats its arguments that Carter was not qualified for the position and that Haynes was more qualified for the position. By articulating these reasons and attempting to support them with evidence, Three Springs has carried its intermediate burden and the presumption of racial discrimination drops from the case. The burden now shifts back to Carter to show that Three Springs' reasons are pretextual. If Carter has produced evidence casting doubt on Three Springs' reasons, there is a jury issue.

## 3. Carter's Arguments of Pretext

We need not tarry long on this question, because it is clear that evidence produced by Carter in support of his prima facie case creates a genuine issue as to material facts, namely whether Carter was qualified for the position and whether Haynes was more qualified than Carter. Additionally, we note that Carter produced additional circumstantial evidence that does not neatly fall into the *McDonnell Douglas* framework that, nevertheless, is relevant to the issue of pretext.

For example, Carter proved that Three Springs had a policy of posting job vacancies, not adhered to in this case. We have held that the failure to promulgate hiring and promotion policies

can be circumstantial evidence of discrimination. *See Harris v. Birmingham Bd. of Educ.,* 712 F.2d 1377, 1382-83 (11th Cir.1983). Certainly, it is even more suspicious where it is alleged that established rules were bent or broken to give a non-minority applicant an edge in the hiring process. *See Morrison v. Booth,* 763 F.2d 1366, 1373-74 (11th Cir.1985).

Additionally, several affidavits improperly stricken by the district court[10] related instances of alleged disparate treatment that could be relevant to a trier of fact in evaluating Three Springs' motives. For example, Tyrone Bowling, a former Counselor Aide, recounted an incident involving Cook:

> I has a problem with respect to Ms. Cook in that there was an incident in which I was disciplined as a result of my talking with one of the adolescents about religion. This led to my termination, but a similarly situated white employee engaged in the same contact was not disciplined in any fashion.

Gregory Jones, an activity specialist, stated that he "was involved in an incident involving a written reprimand for a situation dealing with the escape of one of the adolescents, but a white employee, who also had the same offense, was not provided any written reprimand." Samuel Brewer, a Counselor Aide, stated that Carter and he "were paid less in [their] positions than other non-minorities who had lesser educational degrees." Ronnie Johnson, Counselor Aide, stated that he was asked "to be involved in the direct monitoring of another black ... employee in order to help assist management in getting information on this black employee so that they could terminate this person." Given the foregoing, Carter produced evidence that, if believed, could be found to cast doubt on the credibility of the reasons stated by Three Springs for hiring Haynes instead of Carter.

## IV. CONCLUSION

---

[10]In each affidavit, the affiant stated that he or she had personal knowledge of its contents. Furthermore, the following experiences of Three Springs employees are clearly *legally relevant* to the issue of pretext. These statements should, therefore, be considered to be part of the summary judgment record.

We emphasize that Carter has not yet proven his case. A reasonable trier of fact may well decide that Three Springs' decision makers believed that Carter was not, in fact, qualified for the promotion, or that Haynes was the most qualified candidate. We hold only that Carter has raised a genuine issue of material fact, through the production of circumstantial evidence, as to the motivation behind Three Springs' decision to promote Greg Haynes instead of Charles Carter. Therefore, we REVERSE the entry of summary judgment and REMAND to the district court for trial.

REVERSED and REMANDED.