Wilner VINCENT, Plaintiff,

v.

**WELLS FARGO GUARD SERVICES, INC. OF FLORIDA, et al.,** Defendants.

No. 95–1998–CIV.

United States District Court, S.D. Florida, Miami Division.

March 10, 1998.

William G. Bell, Miami, FL, for Plaintiff.

Thomas L. Henderson, McKnight Hudson Lewis et al, Memphis, TN, Sherryll Martens Dunaj, Martens Dunaj et al, Miami, FL, for Defendants.

## ORDER

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant's Counter–Motion for Summary Judgment ("Counter–Motion") (DE # 80)[1] and Plaintiff's Motion for Summary Judgment as to Certain of Defendants' Affirmative Defenses ("Motion") (DE # 161).[2]

UPON CONSIDERATION of the Counter–Motion, Motion, responses, supplemental memoranda, materials submitted, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

## STATEMENT OF FACTS [3]

Plaintiff, Wilner Vincent ("Vincent"), is a black Haitian born on December 12, 1971. Affidavit of Wilner Vincent ("Vincent Affidavit") at ¶ 2. Vincent was employed by Defendant Wells Fargo Guard Services, Inc. of Florida ("Wells Fargo") from May of 1992 to February 3, 1995. *Id.* at ¶ 3.

### I. § 1981 and Title VII ClaimsDiscriminatory Job Assignments

Vincent posits that there are "undesirable" and "desirable" posts to which Wells Fargo guards are assigned.[4] *See* Third Amended Complaint at ¶ 8. Vincent contends that black and Haitian guards are assigned to "undesirable" posts while whites and Hispanics are assigned to "desirable" posts.[5] *Id.* Vincent defines "undesirable" posts as posts where there is no rest room or phone access and posts that are "in the middle of nowhere." Deposition of Wilner Vincent of March 4, 1996 ("Vincent Deposition") at 38–39. Vincent considers a construction site to be an "undesirable" post. *Id.* at 39. Vincent cites Aero Thrust, a post with no water or toilets and which paid $5.00 an hour, as an example

---

1. Although titled "Defendant's" Cross–Motion, the Cross–Motion was filed by all Defendants to this action.

2. Defendants have moved for summary judgment on all counts of Plaintiff's Third Amended Complaint. Plaintiff has moved for summary judgment as to Defendants' Second, Fourth, Eighth, Tenth and Eleventh Affirmative Defenses. Plaintiff's Motion will be addressed during the Court's discussion of the count to which the particular affirmative defense is asserted.

3. Unless otherwise noted, the following facts are undisputed.

4. Wells Fargo disputes Vincent's classification and objects to a racial discrimination claim founded on Vincent's subjective perception of "desirable" versus "undesirable" posts.

5. Wells Fargo disputes Vincent's allegation and claims that assignments are based on an account manager's experience and, in the case of a new guard, on the guard's background. Deposition of Hector Jose Ventura of May 3, 1996 ("Ventura Deposition") at 23.

of an "undesirable" post to which he was assigned.[6] Vincent's Second Affidavit in Support of His Motion for Summary Judgment as to Certain of Defendants' Affirmative Defenses ("Second Vincent Affidavit") at ¶ 9.

Vincent defines a "desirable post" as one with a telephone, water and a bathroom. Vincent Deposition at 42. An office building would be considered a "desirable" location. *Id.* at 44. Vincent provides contradictory testimony as to whether or not he was ever assigned to "desirable" posts. At certain points during his deposition, Vincent admits that he was assigned to what he deemed to be "desirable" posts. *Id.* at 46, 74. The Mutual of Omaha Building would be an example of a "desirable" post to which Vincent was assigned. *Id.* at 44; Vincent Affidavit at ¶ 45. However, at another point during his deposition, Vincent states, "every post that I went to was what we called undesirable." *Id.* at 144. According to a chart prepared by Wells Fargo which sets forth (1) Vincent's assignments from 1992 to 1994, (2) the availability of water and bathroom facilities at certain of those locations and (3) whether certain posts to which Vincent was assigned were indoors or outdoors, Vincent was assigned to several locations which would fall under his definition of a "desirable" post. *See* Exhibit 1 to Defendants' Supplemental Memorandum in Support of Their Counter-Motion for Summary Judgement Filed Pursuant to This Court's March 28, 1997 Order. A Blockbuster Video store was considered somewhat "undesirable" by Vincent because, although it had water and a bathroom, "you were not allowed to lean" and you had to stand at the door and greet people. Vincent Deposition at 79–80.

According to Vincent, evidence of discriminatory treatment of blacks and Haitians can be found in the fact that he always relieved blacks and Haitians at "undesirable" posts. *Id.* at 42–43; Vincent Affidavit at ¶ 32. In support of the allegation that whites and Hispanics were sent to "desirable" posts, Vincent testified that one of the employees at

the Mutual of Omaha building told Vincent that he was the first black person to stay on the post. *Id.* at 44.

On May 5, 1992, Vincent signed a Wells Fargo document which stated, "It is clearly understood and agreed that any assignment I accept is temporary and the scheduled shift, pay rate or location of my employment may be changed, at the discretion of Wells Fargo Guard Service or any client to whom I am assigned." *See* Exhibit 11 to Vincent Deposition. Account managers at Wells Fargo were responsible for making guard assignments. Vincent Deposition at 39; Deposition of Benjamin Blair of May 3, 1996 ("Blair Deposition") at 37. During the course of Vincent's employment at Wells Fargo, the three account managers were Hispanic. Deposition of Hector Jose Ventura of May 3, 1996 ("Ventura Deposition") at 8–9. Vincent claims that Hispanic account managers put Hispanic guards at certain posts while bumping others from those posts. Vincent Deposition at 57–58. Vincent testified that if he was at a good post and an account manager's relative got a license, Vincent would be bumped. *Id.* Vincent asked his account managers to assign him to more "desirable" daytime posts which paid more money, but account managers refused. *Id.* at 161–62; Vincent Affidavit at ¶ 33. Vincent claims that he knew more "desirable" posts were available because he would overhear dispatchers talking about new contracts at "nice places." Vincent Deposition at 40.

At Wells Fargo, there is no system of seniority bidding for particular posts, and there is no policy whereby an account manager takes a guard's seniority into account when making assignments. Blair Deposition at 37. Wells Fargo claims that assignments are made on the basis of the account manager's experience and, in the case of a new hire, the guard's background. Ventura Deposition at 23. When asked how a guard with two years seniority is assigned to a post, Ventura replied, "When the right post comes along, I will know if he is good for that post or not." *Id.*

---

6. Wells Fargo lists "Arrow Thrust Corp." as a post where toilet facilities and water are available. *See* Exhibit 1 to Defendants' Supplemental

Memorandum in Support of Their Counter-Motion for Summary Judgement Filed Pursuant to This Court's March 28, 1997 Order.

Vincent also alleges that black and Haitian guards are assigned to lower paying posts than white and Hispanic guards. *See* Third Amended Complaint at ¶ 9. Different posts at Wells Fargo pay different amounts. Vincent Deposition at 46. Depending on the particular post, guards at Wells Fargo were paid between $4.25 to $9.00 per hour. Exhibit 19 to Ventura Deposition. Wells Fargo has submitted an affidavit in which its counsel, after reviewing voluminous documents, attests to and summarizes Vincent's average hourly rate of pay from 1992 to 1995. *See* Exhibit 2 to Defendants' Supplemental Memorandum in Support of Their Counter–Motion for Summary Judgement Filed Pursuant to This Court's March 28, 1997 Order. According to the information submitted by Wells Fargo, Vincent earned between $4.25 and $6.00 an hour during 1995, with the majority of earnings at $6.00 an hour. *Id.* at ¶ 4. During 1993 and 1994, Vincent earned between $5.00 and $6.00 an hour. *Id.* at ¶¶ 5, 6. In 1992, Vincent earned between $5.00 and $5.50 an hour. *Id.* at ¶ 7. In support of his position, Vincent offers the number and overall percentage of black guards assigned to four posts in 1994 and the hourly rate of pay for each of the four assignments. *See* Attachment A to Vincent's Updated Response to Defendant's Counter–Motion for Summary Judgment. Vincent does not state whether he worked at those four posts during 1994, the year on which the information is based. *See id.*

## II. Americans with Disabilities Act

Vincent suffers from sickle cell anemia. Vincent Affidavit at ¶ 4. Vincent was first diagnosed with sickle cell anemia in 1979 or 1980 while living in Haiti. Vincent Deposition at 15–17. Prior to being diagnosed, Vincent would get sick and have to stay in bed for two or three weeks. *Id.* at 17. When he arrived in the United States in 1979, Vincent was not treated by a doctor for sickle cell anemia. *Id.* at 20. When he had a sickle cell crisis, which was usually two or three times a year, Vincent would stay home from school and deal with the pain. *Id.* at 20, 23. When he was in high school, maybe in tenth or eleventh grade, Vincent was treated by Dr. Jacobson three times a year for sickle cell episodes. *Id.* at 26–28. Dr. Jacobson would give Vincent a shot, prescribe medication and order Vincent to drink a lot of fluids. *Id.* at 27.

Vincent claims that being upset, including not being happy at the post to which he is assigned or doing something that he does not want to do, causes him to have a sickle cell crisis. *Id.* at 28–29, 172. In addition, working past midnight and not getting eight hours of sleep causes swelling in his joints and affects his condition. *Id.* at 28–29. Vincent testified, however, that the darkness itself does not affect his condition. *Id.* at 92. According to Vincent's physician, Dr. Blake, there is nothing that would cause someone to suffer a crisis just because they happen to work at night versus during the day. Deposition of Dwight D. Blake, M.D. ("Blake Deposition") of May 30, 1996 at 18, 26 and 37. At times, Vincent's crises strike without warning. Vincent Affidavit at ¶ 48. At other times, Vincent feels the crises coming on. *Id.* Vincent's crises vary in intensity and are characterized by severe pain in the hips, legs, knees, back and chest wall. *Id.* at ¶ 11; Blake Deposition at 12. Various factors, including Vincent's hydration level, nutritional state and some social aspects like fatigue, stress and being overworked, may affect the severity of a sickle cell attack. *Id.* at 15–16. However, there is nothing that either a patient or an employer can do to prevent a sickle cell attack, although following certain regimens could lessen a crisis. *Id.* at 18–19. If the pain is bad enough, Vincent may be unable to walk and may become incapacitated during a sickle cell attack. *Id.* at 12. In Dr. Blake's opinion, people are unable to work when they are in a sickle cell crisis. *Id.* at 14. When treated at a hospital during a crisis, Vincent is given Demerol. Vincent Affidavit at ¶ 12. Between crises, Vincent takes folic acid and Percocet for the pain. *Id.* at ¶ 13. Otherwise, he is in good health and is a strong, active person. *Id.* Dr. Blake testified that Vincent has a mild form of sickle cell anemia because he does not suffer as many crises as other sickle cell patients, he is not as debilitated as other patients and he does not require medication like other patients. Blake Deposition at 13, 22.

When interviewing at Wells Fargo, Vincent volunteered that he suffered from sickle cell anemia and, therefore, could not work the night shift because it would cause him to go into a sickle cell episode. *Id.* at 31, 149; Vincent Affidavit at ¶ 5. The Wells Fargo interviewer responded that there was no problem so long as Vincent did not "fall out on him." Vincent Deposition at 31. In his application to Wells Fargo, Vincent certified that he was "willing and available to work at any shift, any day, anytime." *Id.* at 138; Exhibit 11 to Vincent Deposition.[7] When Vincent was first employed by Wells Fargo, he was told that no day shifts were available and that he would be temporarily assigned to a night post. Vincent Affidavit at ¶ 6. Vincent was assigned to the midnight to 8:00 a.m. shift at the Key Biscayne Yacht Club until February of 1993 when he had a sickle cell crisis. *Id.* at ¶ 7.

The frequency of Vincent's sickle cell crises increased when Vincent started working at Wells Fargo. *Id.* at 172. Once Vincent obtained insurance through Wells Fargo, he would go to the hospital emergency room if he was having a crisis. *Id.* at 24. When Vincent had his first crisis at Wells Fargo, he was taken to Parkway Hospital and treated by Dr. Morrison. *Id.* at 59–60. After Vincent suffered a second sickle cell crisis, Dr. Morrison ordered that he work day shifts. *Id.* at 59. Vincent obtained a doctor's note regarding temporary assignment to day shifts and gave it to the people at Wells Fargo. *Id.* at 61; Exhibit 3 to Vincent Deposition; Deposition of Dr. Michael Morrison ("Morrison Deposition") of May 31, 1996 at 19–20. Initially, Wells Fargo assigned Vincent to day shifts at sites where there was no water or toilet facilities. *Id.* at 62. Eventually, Vincent was reassigned to night shifts. *Id.* at 64. When Vincent complained about not being able to work at night, he was told that it would be a temporary assignment because no day posts were available. *Id.* at 65. Vincent worked the night shifts because he needed the money. *Id.* at 67. Vincent maintains that, prior to the second crisis, it was not acceptable for him to work night

shifts, but he did so because he had no choice. *Id.*

On May 15, 1993, Vincent suffered a sickle cell crisis while working a morning shift at Mack Truck and had to be taken to the hospital. *Id.* at 75–76; Exhibit 9 to Vincent Deposition; Vincent Affidavit at ¶ 9. The sickle cell crisis occurred while Vincent was sitting in his car after relieving another guard. Vincent Deposition at 130. Vincent was sitting in his car in pain when a Mack Truck employee discovered him. *Id.* Vincent had attempted to call over a Wells Fargo field supervisor for assistance, but it appears that the field supervisor thought Vincent was simply waving "hello." *Id.* at 132. Vincent was hospitalized from May 15, 1993 to May 21, 1993. Vincent Affidavit at ¶ 9. Dr. Morrison, Vincent's treating physician at the time, categorized the May 1993 crisis as a severe crisis requiring a fair amount of Demerol. Morrison Deposition at 11–13. When he recuperated, Vincent was told that Wells Fargo no longer had the contract with Mack Truck. Vincent Deposition at 76–77.

From May of 1993 to January 28, 1995, Vincent did not suffer any sickle cell crises which caused him to miss work. Vincent Affidavit at ¶ 10. In January of 1995, Vincent was assigned to work at a Blockbuster Video in Miami Beach which was forty-five minutes from his house. *Id.* at 68–69, 77. Vincent had to take the bus to the post because his car was being serviced. *Id.* at 69. Someone at Wells Fargo told Vincent to take the bus to work and that arrangements would be made to pick Vincent up at the post. *Id.* On his first night at the post, Vincent waited until 2:00 a.m. for someone to pick him up, but no one arrived. *Id.* The following day, on January 27, 1995, Vincent suffered a mild crisis which caused him to be late to work by twenty minutes. *Id.;* Vincent Affidavit at ¶ 10. He arrived at the post at the same time as a Wells Fargo field supervisor who wanted to write up Vincent for being late. Vincent Deposition at 70. In the end, the field supervisor told Vincent to go home and return to the post the next day. *Id.* The next day, on January 28, 1995, Vin-

---

7. It is not clear from Vincent's deposition testimony whether it was true that he could work any shift at the time he applied to Wells Fargo. *Id.* at 138–39.

cent continued to have mild symptoms on his way to work. *Id.;* Vincent Affidavit at ¶ 17. While at a bus stop, the pain grew increasingly worse, and Vincent had to call a friend to take him to the hospital. Vincent Deposition at 70–71. At the hospital, Vincent asked a nurse to call his wife and advise her of his condition. *Id.* at 71. Vincent asked that his wife call Wells Fargo to inform them that he was in the hospital. *Id.* Vincent remained in the hospital for eight hours. *Id.* He was given an IV and Demerol and was prescribed Percocet and extra-strength Tylenol. *Id.;* Vincent Affidavit at ¶ 18.

On January 30, 1995, Vincent called Wells Fargo and spoke to his account manager. Vincent Deposition at 71; Vincent Affidavit at ¶ 20. The account manager inquired about Vincent's return to work. Vincent Deposition at 71. Vincent explained that he would first need to get a doctor's note. *Id.* Approximately fifteen minutes later, the account manager called Vincent and asked him to turn in his uniforms. *Id.* at 72. Vincent was told that they had to let him go because he was not showing up to work on time and because he was getting too sick. *Id.* at 72–73. A couple of days later, Vincent was called back to the office and told that there was a new post to which he would be assigned. *Id.* at 73. Vincent worked at the new post for three days. *Id.* at 74. On the third day, February 3, 1995, Vincent received a phone call from Wells Fargo advising him that he could no longer work for the company because he became too sick too often. *Id.;* Vincent Affidavit at ¶ 23. Vincent was ultimately terminated on February 3, 1995. Vincent Deposition at 83.

### III. Family and Medical Leave Act

Vincent was employed by Wells Fargo from May of 1992 to February 3, 1995. Vincent Affidavit at ¶ 3. Vincent was an "eligible employee" as defined by the Family and Medical Leave Act. Updated Pre-trial Stipulation at 7. In addition, the relevant facts set forth above as to Vincent's Americans with Disabilities Act claim are incorporated herein for purposes of addressing Vincent's Family and Medical Leave Act claim.

### IV. Discriminatory Discharge in Violation of § 1981, Title VII and § 448.075, Fla. Stat.

Vincent suffers from sickle cell anemia. Vincent Affidavit at ¶ 4. Vincent suffered a sickle cell crisis on January 28, 1995. *Id.* at ¶¶ 17 & 18. As a result of the crisis, Vincent was taken to the hospital and was unable to report to his assigned post. *Id.* at ¶ 17. On January 30, 1995, Vincent called Wells Fargo and spoke to his account manager about returning to work. *Id.* at ¶ 20. On that same day, Vincent was told that Wells Fargo had to let him go because he was getting too sick. *Id.* at ¶ 21. A couple of days later, Vincent was called back to the office and told that there was a new post to which he would be assigned. *Id.* at ¶ 22. On February 3, 1995, Vincent was once again told that he could no longer work for Wells Fargo because he became too sick too often. *Id.* at ¶ 23. Vincent was ultimately terminated on February 3, 1995. *Id.*

### V. ERISA and Related § 1981 and Title VII Claims

Borg–Warner Security Corporation has dozens of different medical plans for its employees. Deposition of Edward Scott Ray ("Ray Deposition") of June 27, 1996 at 6. Eligibility for a particular medical plan is based on employment status. *Id.* For purposes of determining eligibility in a particular plan, employees are divided into two groups—salaried, unallocated employees and hourly, allocated employees. *Id.* Unallocated employees include management and secretarial staff. *Id.* at 7. Security guards are allocated employees. *Id.* at 8. There are different categories of plans for security guards. *Id.* One group, which includes the majority of security guards, does not have a standard medical plan. *Id.* Another group includes security guards working for clients who provide benefits for their guards. *Id.* at 8–9. A third group includes guards in a supervisory capacity who are provided with the same choice of medical plans as those offered to unallocated employees. *Id.* at 9. Most security guards pay 100% of their medical plan premiums. *Id.* at 11. However, there are some job sites at which the clients contribute

to the guards' medical coverage. *Id.* The medical plan for unallocated employees generally pays better benefits than the medical plan for security officers. *Id.* at 14. The discrepancy in coverage is a result of having to maintain reasonable prices for medical plans so that guards can have affordable medical coverage. *Id.*

Vincent's health benefits plans from Wells Fargo contain a "Statement of ERISA Rights" and state that Vincent, as a participant in the employee benefits plan, is entitled to certain rights and protection under the Employee Retirement Income Security Act of 1974 ("ERISA"). Exhibit A and B to Deposition of Loretta Steelman of June 27, 1996 ("Steelman Deposition"). In a section titled "Continuation of Health Coverage," the plans provide that, under the requirements of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), an employer must offer to continue group health benefits to certain employees and dependents. *Id.* The plans state that the "ERISA" plan administrator or employer must notify the employee of the right to continue medical coverage. *Id.* The plans' schedule of benefits lists the employee benefits manager as the plan administrator. *Id.*

Vincent did not receive a COBRA notice upon being terminated by Wells Fargo. Ray Deposition at 36–37. Vincent was not sent a COBRA notice until April of 1996. Second Vincent Affidavit at ¶ 8. In its Counter–Motion, Wells Fargo conceded that Vincent was entitled to a COBRA notice. Counter–Motion for Summary Judgment at 25. Between the time Vincent was terminated and the time he came under his subsequent employer's insurance plan, neither Vincent nor his family had to be treated by medical doctors or taken to the hospital. Vincent Deposition at 105, 182.

Strategic Resource Company ("SRC") is a third-party administrator that contracts with Wells Fargo or Borg Warner to administer Wells Fargo's plan for health benefits. Steelman Deposition at 4, 6. SRC accepts premiums and processes claims under the plan. *Id.* at 6–7. Vincent's health care benefits plan from 1992 to 1995 had a $100 deductible for each cause, paid 50% of covered outpatient expenses up to a maximum of $5,000 for 52 weeks for each cause and paid $200 per day for hospital care for a maximum of 365 days. *Id.* at 8. Vincent's $918 claim for outpatient treatment received at Parkway Regional Medical Center on January 28, 1995 was denied by SRC because the maximum benefit period of $5,000 or 52 weeks had expired. *Id.* at 12, 30, 44–45. Wells Fargo claims that Vincent was sent two denial letters regarding claims submitted under the medical benefits plan. *Id.* at 25–26. Vincent denies having received any denial letters. Vincent Affidavit at ¶ 41; Second Vincent Affidavit at ¶ 8.

## DISCUSSION

### I. Summary Judgment Standard

The standard to be applied in reviewing a summary judgment motion is stated unambiguously in Rule 56 of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. *See Twiss v. Kury*, 25 F.3d 1551, 1554 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* However, the non-moving party:

may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Rule 56(e), Fed.R.Civ.P. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In determining whether this evidentiary threshold has been met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513. If the non-movant fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted. *Id.* at 254–55, 106 S.Ct. at 2513–14.

Additionally, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The fail-ure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the Court to grant the motion for summary judgment. *Id.*

## II. § 1981 and Title VII ClaimsDiscriminatory Job Assignments

In Count I of his Third Amended Complaint, Vincent alleges that Wells Fargo discriminated against blacks and Haitians in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e by (1) assigning blacks and Haitians to "undesirable" posts while assigning whites and Hispanics to "desirable" posts and (2) assigning black guards to lower paying posts than white and Hispanic guards.[8]

Section 1981 covers claims for intentional racial discrimination in "the making, performance, modification, and termination of [employment] contracts" and in "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). A successful § 1981 claim requires proof of intentional discrimination. *Brown v. American Honda Motor Company, Inc.*, 939 F.2d 946, 949 (11th Cir.1991), *cert. denied*, 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992). The test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases. *Id.* In assessing § 1981 and Title VII claims, courts employ the *McDonnell Douglas* three part test which is designed to determine a defendant's motivation in taking the challenged action. *Id.*; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[9] Accord-

---

**8.** Originally, Vincent asserted a third basis for racial discrimination—namely, that Wells Fargo provided customers with forms on which customers could request guards according to race. Vincent has since conceded that said forms do not exist. Accordingly, all arguments alleging racial discrimination on the basis of the non-existent forms are denied as moot.

**9.** Vincent may present direct evidence of discrimination to support his § 1981 and Title VII claims and thereby avoid the *McDonnell Douglas* burden-shifting analysis. *See Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir.1997). Direct evidence is "evidence which, if believed, would prove the existence of discrimination without

inference or presumption." *Id.* at 1561 (quoting *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir.1989)). "Direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir.1998) (quoting *Caban–Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir.1990)). An example of direct evidence in a racial discrimination case would be a plant manager's statement that he would not hire blacks because "half of them weren't worth a shit." *See Miles v. M.N.C. Corporation*, 750 F.2d 867, 873–74 (11th Cir.1985). Vincent has not come forward with any evidence

ingly, the Court will address Vincent's § 1981 and Title VII claims simultaneously.

The initial burden under the *McDonnell Douglas* test rests with Vincent who must demonstrate a prima facie case of discrimination by a preponderance of the evidence. *Brown*, 939 F.2d at 949. Under *McDonnell Douglas*, a plaintiff establishes a prima facie case of race discrimination by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). Demonstrating a prima facie case is not onerous; it requires only that a plaintiff establish facts adequate to permit an inference of discrimination. *Id.* If Vincent is able to demonstrate a prima facie case, Wells Fargo must come forward and demonstrate legitimate, nondiscriminatory reasons for its conduct. *Id.* at 1564. If Wells Fargo meets its burden, Vincent must demonstrate that Wells Fargo's reasons are merely pretextual. *Id.* at 1565.

■ There is no question that Vincent, a Haitian male, is a member of a racial minority. Accordingly, the first prong of the *McDonnell Douglas* test for racial discrimination is met. As to the second and third elements of the prima facie test, Vincent alleges two types of adverse employment action which resulted in more favorable treatment to guards outside of his race and national origin—"undesirable" job assignments to black and Haitian guards and better paying assignments to white and Hispanic guards. The Court will address both forms of adverse employment action simultaneously because the two seem to overlap in Vincent's mind. For example, Vincent's testimony that Aero Thrust was an "undesirable" post "because there was no water, no toilets and paid only $5.00 per hour" indicates that the rate of pay contributed to a post's "desirability" or "undesirability."

Reviewing Vincent's submissions in the light most favorable to Vincent, as the Court must for purposes of summary judgment, the Court concludes that Vincent's claims of racial discrimination based on assignment of blacks and Haitians to "undesirable" and lower paying posts cannot survive summary judgment. Vincent's claims are unsubstantiated. For example, Vincent testified that when he was assigned to midnight shifts and shifts that required work and travel after midnight, day shifts to which he could be assigned were available. Vincent Affidavit at ¶ 46. Vincent, however, has not come forward with dates on which the alleged discriminatory activity occurred, examples of daytime assignments which were available on a given date or the post and shift to which he was assigned when daytime shifts were available. Vincent also makes the sweeping allegation that he "always" relieved blacks and Haitians at "undesirable" posts. Vincent Deposition at 42–43, 144–45; Vincent Affidavit at ¶ 32. Vincent, however, does not provide the Court with names or descriptions of the "undesirable" posts where Vincent relieved other black or Haitian guards, the dates on which the activity occurred or the name, gender or even physical description of the guards who Vincent relieved. Vincent claims that he would be bumped from posts so that the family members of Hispanic account managers could be assigned to those same posts. Vincent Deposition at 57–58. Vincent, however, is unable to substantiate this allegation with evidence of the post from which he was bumped, the guard who replaced him or the account manager to whom the replacement guard was related. Finally, Vincent testified that he was assigned to "undesirable" posts while whites and Hispanics were assigned to "desirable" posts. Even if the Court were to accept Vincent's subjective perception of "undesirable" versus "desirable" posts as a measure of discrimination, Vincent would still be unable to avoid summary judgment. While Vincent has provided the Court with examples of posts which he deemed to be "desirable," "undesirable" and "somewhat undesirable," Vincent has not provided the Court with facts to corroborate his allegations of discriminatory assignments. Vincent has failed to set forth any evidence,

which the Court could classify as direct evidence of racial discrimination. Accordingly, the Court will proceed with the circumstantial evidence analysis under *McDonnell Douglas*.

for example, of the total number of "undesirable" versus "desirable" posts available during a given time or to whom those posts were assigned during a particular period. In fact, the only factual support which Vincent gives for his claims of racial discrimination can be found in his testimony about the Mutual of Omaha building, a "desirable" post to which Vincent was assigned. Vincent Deposition at 44. Vincent claims to have been told by an employee at Mutual of Omaha that he was the first black person assigned to the post. *Id.* Even assuming that the Court were to get beyond the hearsay problem in Vincent's testimony,[10] there are still no adequate facts to create an inference of discrimination. Vincent has not set forth, for example, the number or race of other guards who were previously assigned to the post or the duration of the contract between Wells Fargo and Mutual of Omaha for that particular post. In sum, Vincent's testimony about a third party's statement does not suffice to survive summary judgment.

As discussed above, Vincent's burden at this stage was not onerous. Vincent had only to set forth facts adequate to permit an inference of discrimination in order to survive summary judgment. *Holifield,* 115 F.3d at 1562. Vincent, however, provided the Court with nothing more than unsupported, uncorroborated allegations. It is undisputed that a nonmovant may not rely on mere allegations to avoid entry of summary judgment. *Moses v. American Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 964, 136 L.Ed.2d 849 (1997); *see also Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 642 n. 6 (11th Cir.1998) (holding that conclusory and generalized allegations of racial bias such as "there was a racially biased attitude by management towards minority black employees" were properly struck by the district court).

█ The Court will briefly address Vincent's contention that lower paying posts were assigned to blacks and Haitians. In support of his allegation of discriminatory pay. Vincent offers the number and overall percentage of black guards assigned to four posts during 1994 and the rate of pay at said posts. *See* Attachment A to Vincent's Updated Response to Defendant's Counter-Motion for Summary Judgment. It appears that Vincent is attempting to use this "snapshot" of assignments and pay as statistical evidence of discrimination.[11] Statistics alone may be enough to establish a prima facie case of classwide discrimination. *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1131 (11th Cir.1984). As the Eleventh Circuit recently confirmed, however, "statistics alone cannot make a case of individual disparate treatment." *Carter,* 132 F.3d at 642 n. 5 (11th Cir.1998) (quoting *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1132 (11th Cir.1984)). An individual plaintiff must point to some specific instance of discrimination in order to be entitled to a remedy. *Carmichael,* 738 F.2d at 1131. Assuming for purposes of Wells Fargo's Cross-Motion that the "snapshot" provided by Vincent can be considered statistical evidence,[12] Wells Fargo is still entitled to summary judgment because Vincent has been unable to come forward with a specific instance of discrimination. As is set out in greater detail above, Vincent's accusations of racial discrimination do not evolve beyond mere allegations.

█ In sum, Vincent's claims of racial discrimination boil down to uncorroborated allegations and Vincent's opinion that he was discriminated against on the basis of race and/or national origin. As the Eleventh Circuit has noted, mere allegations are insuffi-

---

10. In *McMillian v. Johnson,* 88 F.3d 1573, 1585 (11th Cir.1996), *aff'd,* —— U.S. ——, 117 S.Ct. 554, 136 L.Ed.2d 436 (1996), the Eleventh Circuit held that inadmissible hearsay cannot be used to defeat summary judgment when there is no indication that it can be reduced to admissible evidence at trial.

11. Vincent does not indicate whether he was ever assigned to the posts mentioned in Attachment A.

12. To be meaningful, statistical evidence must have some analytical foundation. *Brown v. American Honda Motor Company, Inc.,* 939 F.2d 946, 952 (11th Cir.1991), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992). In this case, there is no analytical foundation for Vincent's proffered "statistics."

cient to survive summary judgment, *Moses,* 97 F.3d at 447, and a plaintiff's opinion that he has been discriminated against does not suffice to create a prima facie case of race discrimination, *Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir.1997). Accordingly, Wells Fargo is entitled to summary judgment on Count I of Vincent's Third Amended Complaint.

### III. Americans with Disabilities Act

■ In Count II of his Third Amended Complaint, Vincent alleges that Wells Fargo's failure to assign him to day shifts constituted a failure to accommodate his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* To establish a prima facie case under the ADA, Vincent must show the following: 1) he has a disability, 2) he is a qualified individual and 3) he was discriminated against because of his disability. *Pritchard v. Southern Company Services,* 92 F.3d 1130, 1132 (11th Cir.), *amended on reh'g in part,* 102 F.3d 1118 (11th Cir.1996) (modifying last paragraph of opinion with no substantive changes), *cert. denied,* — U.S. ——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). Apparently conceding the first and third prongs of Vincent's prima facie case, namely, that Vincent is disabled for purposes of the ADA and that Vincent was fired because he suffers from sickle cell anemia, Wells Fargo presents the following arguments in support of its summary judgment motion: 1) an assignment to the day shift is not an accommodation under the ADA but only Vincent's personal preference and 2) Vincent is not a "qualified individual" under the ADA because he cannot perform the essential functions of his job with or without reasonable accommodation.[13]

The action before the Court presents a unique set of facts because Vincent, unlike numerous ADA plaintiffs, does not constantly suffer from the effects of his disability. *See* Vincent Affidavit at ¶ 13. In Vincent's case, the manifestations of sickle cell anemia which allegedly render him unable to perform the

essential functions of his job strike approximately three times a year and may strike with or without warning and with varying degrees of intensity. *See* Blake Deposition at 22; Vincent Affidavit at 11, 48. In essence, the timing and degree of Vincent's sickle cell crises are unpredictable. Add to the unpredictable nature of the disability's manifestations the unpredictable nature of the job of a security guard, and you have a case which hinges, in large part, on the unpredictable. As will be discussed below, other courts have faced the same task of examining ADA claims which are driven by considerations of unpredictable factors.

■ Turning to Wells Fargo's second basis for entry of summary judgment in its favor, the Court concludes that Vincent is not a qualified individual for purposes of the ADA. The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In assessing whether certain job functions are essential, consideration shall be given to the employer's judgment, and, if an employer has prepared a written description before advertising or interviewing applicants for the job, the description shall be considered evidence of the essential functions of the job. *Id.* Evidence of whether a particular function is essential may also be found in the following EEOC guidelines: (1) the amount of time spent on the job performing the function; (2) the consequences of not requiring the incumbent to perform the function; (3) the terms of a collective bargaining agreement; (4) the work experience of past incumbents in the job and (5) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3)(iii)–(vii). In addition, a job function may be considered essential because the very reason the position exists is to perform that function. 29 C.F.R. § 1630.2(n)(2)(I).

---

13. In his Motion for Summary Judgment as to Certain of Defendants' Affirmative Defenses, Vincent seeks summary judgment as to Wells Fargo's Fourth Affirmative Defense—that Vincent is not a qualified individual protected by the Ameri- cans with Disabilities Act. The Court will treat the parties' motions on this point as cross-motions for summary judgment and address them simultaneously.

Wells Fargo claims that Vincent cannot, with or without a reasonable accommodation, perform the essential functions of his position as an unarmed security guard for Wells Fargo because his illness is unpredictable and can render him incapacitated while at a post.[14] While Wells Fargo dramatizes Vincent's position as a security guard by arguing that Vincent must at all times be prepared to fight off intruders and paints a portrait of Vincent as akin to a police officer who is always in the line of fire, Vincent minimizes the role of a security guard and ignores the fact that he must be alert and able to report any unusual events or intruders via his walkie-talkie or otherwise. *See* Vincent Affidavit at ¶ 26. The parties can agree, however, that a basic function of Vincent's job is "to observe and report." [15] Thus, Vincent's basic function as a Wells Fargo guard falls squarely within the terms of 29 C.F.R. § 1630.2(n)(2)(I) which provides that "[a] job function may be considered essential because the reason the position exists is to perform that function." [16] In effect, the very essence of a security guard's position is to observe and report, the same basic functions which Wells Fargo claims Vincent is unable to perform.

To defeat summary judgment, Vincent must show that he can perform the essential functions of his position with a reasonable accommodation. *Willis v. Conopco, Inc.*, 108 F.3d 282, 286 (11th Cir.1997); *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir.1996). If Vincent is unable to show the existence of a reasonable accommodation which would allow him to perform the essential functions of his job, he will be unable to show that he is a qualified individual within the meaning of the ADA. *Allen v. Georgia Power Company*, 980 F.Supp. 470, 477 (N.D.Ga.1997). Viewing all evidence presented and drawing all reasonable infer-

ences therefrom in the light most favorable to Vincent, the Court finds that Vincent's proposed reasonable accommodation, assignment to day shifts, would not prevent sickle cell crises from occurring while Vincent is at a post and would not ensure that Vincent could perform the essential functions of observing and reporting a security problem. Vincent's physician, Dr. Blake, testified that there is nothing which Vincent can do to prevent a sickle cell crisis although following certain regimens could lessen a crisis. Blake Deposition at 18–19. Vincent has not come forward with any evidence to support the position that assignment to day shifts would ensure that he could observe and report while stationed at a post. In fact, Vincent's deposition testimony supports Wells Fargo's position. Vincent testified about a sickle cell crisis during a morning shift at Mack Truck in which the pain rendered him unable to move from his car. Vincent Deposition at 130–32. Not having identified an accommodation that would allow him to perform the essential functions of his job, Vincent is unable to survive summary judgment as to the ADA count.

The Court is aware of the Eleventh Circuit's warning in *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 n. 4 (11th Cir.1997), that an employer is not "invariably absolved from having to make reasonable accommodations for a disabled employee whenever a given job involves any measure of unpredictability." As in *Holbrook*, however, the Court's conclusion is mediated by the facts presented in this case. *See id.* The Court reaches its determination after careful consideration of the nature of Vincent's illness, including the disease's ability to incapacitate, Vincent's history of sickle cell attacks, the job functions involved and the unpredictable nature of both Vincent's disability and the

---

14. In addition, Wells Fargo argues that Vincent is not a qualified individual under the ADA because attendance at work is an essential function of a job and Vincent's disease prevents him from attending work. The Court, however, does not need to address the absenteeism question in order to arrive at its holding as to the ADA count.

15. Plaintiff's Updated Memorandum in Support of His Motion for Summary Judgment as to

Certain of Defendants' Affirmative Defenses at 9; Ventura Affidavit at ¶ 3.

16. In addition, the ability to observe and report can be deemed essential by looking at two of the criteria set forth in 29 C.F.R. § 1630.2(n)(3)(I)-(vii), the amount of time spent on the job performing the function and the consequences of not requiring the individual to perform the function.

job of a security guard. In addition, the Court notes that the position of a security guard is not one in which Vincent can set aside the pertinent task at hand and return to it after a crisis has passed. As the Fourth Circuit noted in an analogous context, "[s]afeguarding ... is a task that cannot be reasonably abandoned for even 'a brief period.'" *Martinson v. Kinney Shoe Corporation,* 104 F.3d 683, 687 (4th Cir.1997) (holding that an epileptic shoe salesman charged with maintaining store security was not a qualified individual under the ADA).

The Court acknowledges that Vincent never became incapacitated because of a sickle cell crisis during a security problem at a post to which he was assigned. However, it is also true that neither Vincent nor Wells Fargo nor any trier of fact can predict what Vincent may encounter at a post during an incapacitating sickle cell crisis and cannot preclude the possibility that the unexpected will occur. As the Court noted above, the outcome of Vincent's ADA claim depends, in part, on the Court's consideration of that which is unpredictable.

Other courts have engaged in similar analyses in determining the effect of an unpredictable manifestation of a disability or an unpredictable job function on an ADA claim. In *Turco v. Hoechst Celanese Corporation,* 101 F.3d 1090 (5th Cir.1996), the Fifth Circuit affirmed a summary judgment in favor of an employer on the grounds that the former employee, an insulin-dependent diabetic, could not perform the essential functions of his job. As in the present case, the court pointed to instances in which the employee's disability had affected him while on the job. *Id.* at 1093–94. However, the court partly based its decision on the possibility of a diabetic episode or loss of concentration while the employee was operating complicated machinery or handling dangerous chemicals. *Id.* at 1095. In the present action, there is evidence that Vincent's disability has affected him at work. Like the *Turco* court, the Court cannot ignore the possibility that a

sickle cell crisis will render Vincent incapacitated during a security problem and that Vincent will be unable to report the incident. The Eleventh Circuit, in *Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1528 (11th Cir. 1997), was recently required to explore the unpredictable nature of crime scenes in determining whether an ADA plaintiff who suffered from retinal detachment in both eyes could be provided with a reasonable accommodation to perform the essential functions of his job as police detective. While acknowledging the relative infrequency of the types of investigations which the employee was unable to perform, the Eleventh Circuit noted that the employer police department "cannot predict in advance what crimes will be committed in any given week or what evidence will appear at any given crime scene." *Id.* at 1528. So too, this Court cannot ignore the possibility that Vincent may become incapacitated while at a post and thereby be unable to respond to a given situation by radioing for help or taking other responsive measures.

Based on the foregoing, the Court concludes that, with regard to the position of a security guard at Wells Fargo, Vincent is not a qualified individual for purposes of the ADA. Accordingly, Wells Fargo is entitled to summary judgment on Vincent's ADA claim.

## IV. Family and Medical Leave Act

In Count III of his Third Amended Complaint, Vincent alleges that Wells Fargo violated the Family and Medical Leave Act ("FMLA") by terminating him upon his return to work after a sickle cell episode. In moving for summary judgment on the FMLA count, Wells Fargo alleges that Vincent did not suffer from a "serious health condition" as that term is defined in the FMLA and that Vincent is not a qualified individual because he cannot perform the essential functions of his job as a Wells Fargo security guard.[17]

The FMLA entitles an eligible employee, subject to the certification provisions of

17. In his Motion, Vincent seeks summary judgment as to Wells Fargo's Eighth Affirmative Defense in which Wells Fargo claims that Vincent is not entitled to relief under the FMLA because he did not suffer a serious health condition, was not a qualified individual, did not take leave and failed to give proper notice under the FMLA. Vincent's Motion shall be treated as a cross-motion for summary judgment on the FMLA count.

§ 2613, to a total of 12 workweeks of leave during any 12–month period because of a serious health condition that makes the employee unable to perform the functions of his or her position. 29 U.S.C. § 2612(a)(1)(D). The FMLA defines an "eligible employee" as an employee who has been employed for at least 12 months by the employer with respect to whom leave is requested and for at least 1,250 hours of service with such employer during the previous 12–month period. 29 U.S.C. § 2611(2)(A). For purposes of the FMLA, "serious health condition" means an illness, injury, impairment or physical or mental condition that involves inpatient care in a hospital, hospice or residential medical care facility or continuing treatment by a health care provider. 29 U.S.C. § 2611(11). It is unlawful for any employer to interfere with, restrain or deny the exercise of or the attempt to exercise any rights provided under the FMLA. 29 U.S.C. § 2615(a)(1). The FMLA also prohibits an employer from discharging or discriminating against an individual for opposing any practice made unlawful under the FMLA. 29 U.S.C. § 2615(a)(2). An employer who violates § 2615(a) shall be liable to any eligible employee affected for damages and for such equitable relief as may be appropriate. 29 U.S.C. § 2617(a)(1).

## A. Serious Health Condition

█ Wells Fargo first argues that Vincent did not suffer a "serious health condition" as that term is defined by the FMLA. The parties agree that the Court should examine the regulations implementing the FMLA in order to determine whether Vincent suffered from a serious health condition. The parties disagree, however, as to whether the interim regulations or the final regulations, which became effective on April 6, 1995, should be used by the Court in arriving at its determination. The Court finds that the interim regulations which were in effect in January of 1995, the time of Vincent's termination, govern this action. *See Gay v. Gilman Paper Company,* 125 F.3d 1432, 1434 n. 4 (11th Cir.1997) (holding that the interim regulations governed a dispute in which the serious health condition and subsequent termination occurred prior to April 6, 1995, the effective date of the final regulations).

█ Having resolved the dispute as to which set of implementing regulations governs the instant action, the Court turns to the question of whether Vincent suffered from a "serious health condition." The interim regulations elaborate on the definition of "serious health condition" as follows:

> For purposes of FMLA, "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves:
>
> (1) Any period of incapacity or treatment in connection with or consequent to inpatient care (i.e. an overnight stay) in a hospital, hospice or residential medical care facility;
>
> (2) Any period of incapacity requiring absence from work, school, or other regular daily activities, of more than three calendar days, that also involves continuing treatment by (or under the supervision of) a health care provider; or
>
> (3) Continuing treatment by (or under the supervision of) a health care provider for a chronic or long-term health condition that is incurable or so serious that, if not treated, would likely result in a period of incapacity of more than three calendar days; or for prenatal care.

58 Fed.Reg. 31794, 31817 (1993).

Assuming without deciding that Vincent's sickle cell anemia does not fall within the first or second categories of "serious health condition" set forth above, as Wells Fargo alleges, the Court turns to the third definition of the term. Under the interim regulations, "continuing treatment by a health care provider" includes a situation in which an employee is treated two or more times for the injury or illness by a health care provider. *Id.* As is evident from the deposition testimony of Drs. Blake and Morrison, Vincent was treated two or more times by physicians for his sickle cell anemia so that he may be considered a recipient of "continuing treatment by a health care provider." *See* Morrison Deposition at 11, 30; Blake Deposition at 5, 14, 23. In addition, Wells Fargo concedes and the record reflects that sickle

cell anemia is a chronic, incurable condition. Morrison Deposition at 30; *see* Counter–Motion at 19. A question remains as to whether Vincent's sickle cell anemia, if left untreated, would render Vincent incapacitated for a period of more than three calendar days. On this point, there is no evidence before the Court.[18] Accordingly, Wells Fargo is not entitled to summary judgment as to the FMLA count, there being a genuine issue of material fact as to whether Vincent suffers a "serious medical condition" under the FMLA and its interim implementing regulations.[19]

## B. Qualified Individual vs. Eligible Employee

 Wells Fargo also argues that Vincent is not entitled to protection under the FMLA because his sickle cell anemia renders him unqualified to perform the duties of a Wells Fargo security guard. Wells Fargo is *incorrectly attempting to inject an element of the prima facie case for ADA discrimination into the FMLA.* The FMLA does not set forth any prerequisites to relief dealing with an employee's qualifications for the job in question. In fact, the only prerequisite for FMLA protection, in addition to the certification requirement of § 2613, is contained in *the definition of "eligible employee."* For purposes of the FMLA, an eligible employee entitled to leave is one who has been employed with the employer from whom leave is sought for at least 12 months and for at least 1,250 hours of service during the 12–month period prior to the time leave is sought. 29 U.S.C. § 2611(2)(A). It is undisputed that Vincent was an "eligible employee" as that term is defined in the FMLA. Vincent Affidavit at ¶ 3; Updated Pre-trial Stipulation at 7. There being no additional prerequisite to relief under the FMLA, the Court finds that Wells Fargo is not entitled to summary judgment on Vincent's FMLA claim.[20]

As Wells Fargo admits, the FMLA is silent as to the statute's application when an employee is not a qualified individual with a disability for purposes of the ADA. The implementing regulations, however, are instructive when examining the interrelation between the FMLA and ADA. In quoting a portion of the FMLA's legislative history, the regulations note, "the leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers covered under the ADA." 29 C.F.R. § 825.702(a). The regulations go on to provide, "[a]n employer must therefore provide leave under whichever statutory provision provides the greater rights to the employees." *Id.* Finally, the regulations recognize that "disability" under the ADA and "serious health condition" under the FMLA are different concepts which must be analyzed separately. 29 C.F.R. § 825.702(b).

Upon review of the pertinent portions of the implementing regulations set forth above, the Court concludes that Wells Fargo's attempt to read ADA elements into the FMLA would violate the spirit and purpose of the FMLA. Accordingly, Wells Fargo is not entitled to summary judgment on Vincent's FMLA claim on the basis that Vincent is not a qualified individual under the ADA.

## C. Notice Under the FMLA

 One aspect of Vincent's FMLA count remains to be addressed. Vincent has moved for summary judgment on Wells Fargo's Eighth Affirmative Defense which states, in pertinent part, that Vincent did not provide proper notice of his request for leave under the FMLA. Vincent's wife, Ismane Vincent, claims that she called Wells Fargo on January 28, 1995 to advise that Vincent would not be able go to work because he was in the hospital due to a sickle cell crisis. Deposi-

---

18. Although there is evidence that, prior to being diagnosed, Vincent would get sick and have to stay in bed for two or three weeks, Vincent Deposition at 15–17, and that Vincent has been hospitalized for up to seven days as a result of a sickle cell crisis, Vincent Affidavit at ¶ 9, there is no evidence in the record which speaks to whether incapacity for a period of three days or more would result if Vincent's sickle cell anemia were left untreated.

19. Entry of summary judgment for Vincent on this point is similarly precluded.

20. For the reasons set forth above, Vincent is entitled to summary judgment as to the portion of Wells Fargo's Eighth Affirmative Defense in which Wells Fargo claims that Vincent is not a qualified individual.

tion of Ismane Vincent of May 21, 1996 at 14–15. According to Wells Fargo, Mrs. Vincent did not inform the recipient of the telephone call that Vincent was hospitalized because of a sickle cell anemia crisis and did not give any reason for his absence. Deposition of Lee Karunas of May 21, 1996 at 28–30 & Exhibit 39.

Under the interim implementing regulations which are applicable to the instant action, employees must give notice of the need to take FMLA leave as soon as practicable, usually within one or two working days, when the need for leave is due to an unforeseen event. 58 Fed.Reg. 31794, 31806 (1993). When medical emergencies are involved, notice may be provided via a telephone call from the employee's spouse if the employee is unable to personally provide notice. *Id.* It is clear, however, that the employer must be put on notice that the absence in question is potentially FMLA-qualifying. *See Gay v. Gilman Paper Company,* 125 F.3d 1432, 1436 (11th Cir.1997). A genuine issue of material fact remains as to whether Vincent's wife informed Wells Fargo that Vincent's inability to appear at his post on January 28, 1995 was due to a sickle cell crisis. Accordingly, Vincent is not entitled to summary judgment on the issue of FMLA notice.

## V. Discriminatory Discharge in Violation of § 1981, Title VII and § 448.075, Fla. Stat.

In Count IV of his Third Amended Complaint, Vincent alleges that he was discriminatorily discharged on the basis of race because he suffers from sickle cell anemia, a disease which primarily affects blacks. To succeed in his § 1981 and Title VII claims for discriminatory discharge on the basis of race, Vincent must establish the following: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. *Holifield*

*v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997).[21]

Vincent's § 1981 and Title VII claims must fail because Vincent is unable to establish the fourth element of the prima facie case for racial discrimination—that he was qualified to do the job in question. As was thoroughly discussed above in the section addressing Vincent's claim under the ADA, Vincent is not qualified to perform the essential job functions of a Wells Fargo security guard. As a result, entry of summary judgment in favor of Wells Fargo is appropriate. *See Peoples v. City of Salina, Kansas,* 1990 WL 47436, at *4 (D.Kan.1990) (granting summary judgment for an employer on a § 1981 claim because the employee, who suffered from sickle cell anemia, was not qualified for a firefighter position and, therefore, could not establish an element of the prima facie case for racial discrimination).

Count IV of Vincent's Third Amended Complaint also seeks relief under § 448.075, Fla. Stat., which provides, in pertinent part, "[n]o person, firm, corporation . . . shall deny or refuse employment to any person or discharge any person from employment solely because such person has the sickle-cell trait." The parties have not cited and the Court's independent research has not located cases applying § 448.075, Fla. Stat. Instead, the parties have grouped the state law claim with the § 1981 and Title VII claims. It appears to the Court, however, that § 448.075, which concerns persons with the sickle-cell trait, does not apply to Vincent, who suffers from sickle cell anemia. *See* Vincent Affidavit at ¶ 4.[22] Accordingly, Wells Fargo is entitled to summary judgment as to Vincent's claim pursuant to § 448.075, Fla. Stat.

## VI. ERISA and Related § 1981 and Title VII Claims

In the fifth and final count of his Third Amended Complaint, Vincent alleges that

---

**21.** The test for intentional discrimination under § 1981 is the same as the test used in Title VII discriminatory treatment cases. *Brown v. American Honda Motor Company, Inc.,* 939 F.2d 946, 949 (11th Cir.1991), *cert. denied,* 502 U.S., 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992).

**22.** Both Vincent and his treating physician noted that there is a difference between having the sickle-cell trait and having sickle cell anemia or disease. Vincent Deposition at 8–9; Blake Deposition at 10.

Wells Fargo violated his rights under ERISA by failing to provide a COBRA notice and failing to pay certain health care costs incurred by Vincent prior to his discharge. For good measure, Vincent includes another § 1981 and Title VII racial discrimination claim. In this count, Vincent alleges that Wells Fargo discriminated against Vincent on the basis of race by establishing two medical welfare plans—one for guards, who Vincent alleges are primarily black and Hispanic, and one for supervisors and administrative personnel, who Vincent alleges are primarily white.[23] Wells Fargo has moved for summary judgment on all points.

## A. § 1981 and Title VII Claims

▊ The Court will first address and dispose of Vincent's third attempt at a racial discrimination claim in violation of § 1981 and Title VII. Vincent falls far short of establishing a prima facie case of racial discrimination with regard to the welfare plans provided by Wells Fargo to its employees. In opposing summary judgment, Vincent does no more than provide the Court with a head count of the number of guards eligible to participate in the guards' health insurance program versus those who actually participate in the program and contrasts that with the number of employees eligible to participate in the non-guard health insurance program versus those who actually participate in the non-guard program. See Attachment D to Plaintiff's Updated Response To Defendant's Counter–Motion for Summary Judgment. Without more, Vincent asks the Court to deny summary judgment on this issue.

Vincent has the burden of establishing a prima facie case of racial discrimination by a preponderance of the evidence. *Brown v. American Honda Motor Company, Inc.,* 939 F.2d 946, 949 (11th Cir.1991), *cert. denied,* 502 U.S., 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992). To do so, Vincent must establish facts adequate to permit an inference of discrimination. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997). Vincent, however, opted to provide the Court with nothing more than conclusory allegations of racial discrimination and a head count. As has been previously noted, a nonmovant may not rely on mere allegations to avoid summary judgment. *Moses v. American Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 964, 136 L.Ed.2d 849 (1997). Moreover, providing the Court with the number of participants in each of the two plans, without more, does not come close to establishing the requisite inference of discrimination. In sum, this is the quintessential case of a nonmovant seeking to create some metaphysical doubt as to material facts. The Supreme Court of the United States has unequivocally stated that the party opposing summary judgment carries a heavier burden. *See Matsushita Electric Industrial Co. v. Zenith Radio Corporation,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Accordingly, Wells Fargo is granted summary judgment as to the § 1981 and Title VII counts contained in Count V of Vincent's Third Amended Complaint.[24]

## B. COBRA Notice

Turning to Vincent's first claim under ERISA, the Court concludes that Vincent did not receive the COBRA notice to which he was entitled. As briefly noted above, Wells Fargo originally conceded that Vincent did not receive a COBRA notice although he was entitled to one. Counter–Motion at 25. Wells Fargo now seeks to rescind its concession and argue that Vincent was never entitled to a COBRA notice because the plan in question is not covered by ERISA. Wells–

23. However, the testimony of the Borg–Warner Security Corporation employee who manages group insurance benefits for Wells Fargo reveals that there are dozens of medical plans. Ray Deposition at 5. Security guards do not all fall into the same medical plan. *Id.* at 8–9.

24. It should be noted that the deposition testimony of Edward Scott Ray, the person who manages group insurance benefits for Wells Fargo, indicates that any discrepancy in benefits is a result of making reasonably priced medical plans available to security guards. Ray Deposition at 5. Thus, even assuming that Vincent were able to establish a prima facie case of racial discrimination regarding the medical plans, Wells Fargo has provided a non-discriminatory reason for the separate plans which remains unrebutted by Vincent.

Fargo's about-face will not be addressed by the Court, particularly in light of the fact that the benefit plans in question specifically address the participant's rights under ERISA and COBRA. Exhibit A and B to Steelman Deposition.[25] Accordingly, the portion of Wells Fargo's Cross–Motion addressing the COBRA notice is denied.

 Wells Fargo goes on to make a "no harm, no foul" argument with regard to its failure to provide Vincent with a COBRA notice. While it is undisputed that neither Vincent nor his dependents were hospitalized or treated by physicians during the period between Vincent's termination and the time Vincent came under another insurance plan, the Court's inquiry does not end. Pursuant to 29 U.S.C. § 1132, an administrator who fails to comply with the COBRA notice provisions may, in the Court's discretion, be personally liable to a plan participant in the amount of up to $100 a day from the date of such failure. The penalty to be assessed, if any, remains for the Court's consideration at trial.

## C. Denial of Benefits

 The Court finds that a genuine issue of material fact precludes entry of summary judgment in favor of Wells Fargo on the denial of medical benefits claim. Specifically, the Court finds that a genuine issue of material fact remains as to whether Wells Fargo provided Vincent with notice of the denial of medical benefits as required by 29 U.S.C. § 1133.[26]

## CONCLUSION

Based on the foregoing, it is ORDERED AND ADJUDGED that Wells Fargo's Counter–Motion for Summary Judgment (DE # 80) is GRANTED as to Counts I, II, IV and the § 1981 and Title VII claims contained in Count V of Vincent's Third Amended Complaint. Well's Fargo's Counter–Motion for Summary Judgment is DENIED as to Count III and the COBRA notice and medical benefits claims contained in Count V of Vincent's Third Amended Complaint.

Vincent's Motion for Summary Judgment as to Certain Affirmative Defenses (DE # 161) is GRANTED as to the portion of Wells Fargo's Eighth Affirmative Defense regarding Vincent's status as a qualified individual, DENIED AS MOOT as to Wells Fargo's Eleventh Affirmative Defense, and DENIED as to Wells Fargo's Second and Fourth Affirmative Defenses and as to the portions of Wells Fargo's Eighth Affirmative Defense regarding the issue of a "serious medical condition" under the FMLA and notice.

---

**25.** In his Motion, Vincent seeks entry of summary judgment as to Wells Fargo's Eleventh Affirmative Defense, that Vincent's health benefits plan was not covered by ERISA and COBRA. In light of the Court's decision to accept Wells Fargo's concession regarding Vincent's entitlement to COBRA notice, the portion of Vincent's Motion regarding Wells Fargo's Eleventh Affirmative Defense is denied as moot.

**26.** Vincent has moved for summary judgment as to Wells Fargo's Second Affirmative Defense in which Wells Fargo argues that Vincent is precluded from recovering under ERISA because he failed to exhaust available administrative remedies. In light of the Court's finding that a genuine issue of material fact remains regarding whether notice of the denial of benefits was ever sent to Vincent, Vincent's Motion as to Wells Fargo's Second Affirmative Defense is denied.