[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 30, 2005
THOMAS  K. KAHN
CLERK

_____

No. 05-13259
Non-Argument Calendar
_____

D. C. Docket No. 02-03180-CV-B

MARIA JOHNSON,

Plaintiff-Appellant,

versus

JIM NICHOLSON,
Secretary of Veterans' Affairs,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(November 30, 2005)

Before BLACK, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Maria Johnson, a Filipino nurse, appeals the district court's order granting

summary judgment in favor of her employer, Birmingham Veterans Affairs Medical Center ("BVAMC"), in her action alleging racial and ethnic discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1) & 2000e-3(a). The district court granted summary judgment because Johnson failed to proffer sufficient evidence that BVAMC's legitimate, nondiscriminatory and non-retaliatory reasons for its employment actions were pretextual. After review, we affirm.[1]

## I. BACKGROUND

Johnson was employed as a Nurse Manager in the Ambulatory Care area at BVAMC. In 1996, Juan Morales became BVAMC's Chief Nursing Supervisor and was in Johnson's supervisory chain. Beginning in 1997, Johnson twice testified in EEOC proceedings in favor of a former co-worker, Adelaida Baltazar, who claimed that Juan Morales had discriminated against her based on her Asian-Pacific/Filipino descent. Johnson first testified for Baltazar in October 1997 and then a second time on March 6, 1998.

Johnson alleges that, after her testimony, Morales began discriminating and

---

[1] We review de novo a district court's order granting summary judgment, "viewing all the evidence, and drawing all reasonable inferences, in favor of the non-moving party." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 767 (11th Cir. 2005). Summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Id. (citing Fed. R. Civ. P. 56(c)).

retaliating against her. Shortly after Johnson's first EEOC testimony, Morales ordered the removal of overtime pay in the amount of $358.24 that had been automatically deposited in Johnson's bank account. Morales did so because it was his policy to require supervisors to get his pre-approval before working overtime and Johnson had not received his approval for that overtime.[2]

Sometime after Johnson's October 1997 testimony for Baltazar, but before her March 1998, testimony, Johnson attended a Nurse Managers' meeting in which Morales said that another hospital employee, Doris Blue, had filed "an EEO" against him and that he needed the Nurse Managers' support. He stated that Ms. Blue "just doesn't understand culture" and then explained, "For example, orientals don't look you in the eye when they talk to you." Morales directed these comments to the group, not to Johnson specifically.

When Morales arrived at BVAMC in 1996, he began planning to restructure the entire nursing staff at the hospital. The restructuring began in 1997 in the Acute Care Services area. The number of Nurse Managers in Acute Care Services was reduced from nine to seven.

The Ambulatory Care area, in which Johnson worked, was the second nursing unit to be restructured, which began in 1998. At the time of the

_____

[2] Morales later agreed to restore $167.24 of the overtime pay.

restructuring, the Ambulatory Care area had four Nurse Managers – Johnson, Erma Jackson, Ruth Fields and Frances McCree.[3] Before the reorganization Johnson was the Nurse Manager for primary care and the medical and surgical speciality clinics, Ida Fields for ambulatory surgery, Frances McCree for the blind rehabilitation center, and Erma Jackson for the emergency room.

On March 6, 1998, Audrey Moore, who supervised the four Nurse Managers, called a meeting and asked them to brainstorm about solutions if the number of Nurse Managers were reduced from four to three. During the meeting, McRee stated that she would retire within the next year. On March 16, BVAMC Director Y.C. Parris announced the restructuring of the Ambulatory Care area in a meeting and circulated a projected organizational chart, which showed Johnson as Nurse Manager in primary care but not in the medical and surgical specialty clinics.[4] The chart described by Johnson is not in the record. However, the record contains an undated organizational chart that twice included Jackson's name as a Nurse Manager, but did not contain the names of Johnson, Fields, Moore or Morales or their positions. At a subsequent meeting on either March 22 or March 26, Morales announced that the number of Nurse Managers was being reduced to

---

[3] None of the other Nurse Managers was Asian or Filipino.

[4] In a statement given to the EEOC investigator, Johnson testified that she attended a meeting with Parris on March 16, 1998, in which she viewed an organizational chart which listed her name, but not as part of management. This chart does not appear in the record.

two.[5]  After the reorganization, the newly-created Nurse Manager positions were for: (1) ambulatory surgery, observation unit and speciality clinics, and (2) primary care, emergency room and blind rehabilitation center.

In June and July of 1998, Johnson's office, along with the offices of other employees, was relocated due to construction in the hospital.  Johnson's second move was to a vacant area of the sixth floor in a room that was dirty and had holes in the carpet.  The decision to move offices, including Johnson's office, was made by a construction committee chaired by the BVAMC director.  Morales was on the construction committee and gave input to the committee when his areas were affected.

In July 1998, the two newly-restructured Nurse Manager positions were posted.  Johnson applied for both positions.  Fields and Jackson each applied for one of the positions.  A panel consisting of Morales and two other BVAMC employees selected by Morales interviewed the three candidates.  During the interview, each candidate was asked the same thirteen questions and scored by the evaluators.  All three evaluators gave Johnson a lower score than either Jackson or

---

[5] Also in late March, Moore, who was transferring to another medical center, appointed Jackson to be Acting Ambulatory Care Nursing Supervisor ("ACNS") in her place, even though Johnson had held the position in the past.   In addition, in the six months following her March 6 testimony, Johnson lost some of her duties, including supervision of the speciality clinic, one-on-one interview duties and duties relating to planning renovations and relocations.

Fields.[6]

Morales was the final selecting official and selected Jackson to be the Nurse

Manager for emergency room, primary care and blind rehabilitation and Fields to

be the Nurse Manager for ambulatory surgery facility, observation unit and

speciality clinics.  Morales explained that Johnson was not selected for either

position because she received the lowest interview scores and because, unlike

Jackson and Fields, she did not have a Master's degree or additional certification.

In addition, Morales considered the three candidates' specific experience in

the various units of Ambulatory Care.  According to Morales, all three candidates

had comparable nursing and management experience.[7]  But, Morales explained in a

---

[6] The scores from the three evaluators were as follows:

|         | Dickerson | Hahn | Morales |
|---------|-----------|------|---------|
| Johnson | 24        | 37   | 16      |
| Jackson | 31        | 39   | 31      |
| Fields  | 38        | 39   | 28.5    |

Each candidate was asked the same thirteen questions, which were worth up to three points.  If a candidate did not answer a question, she received a zero.  Depending upon how well the candidate answered a question, she could receive between one and three points.  The highest score a candidate could receive was 39 points.

[7] With regard to the candidates' experience, Johnson had 30 years of nursing experience, sixteen of those in management.  Jackson had eighteen years of nursing experience, with four years in management.  Fields had eighteen years of nursing experience, with ten years in management.  Both Jackson and Johnson had ten years of experience with the acute care unit, the emergency room and the blind rehabilitation center.  With regard to the ambulatory surgery, the observation unit, and the specialty clinics, Johnson had ten years of experience and Fields had nine.

6

statement given during administrative proceedings in the Equal Employment Opportunity Commission that Jackson and Fields had experience in particular areas that played a role in his decision. For example, Jackson had emergency room experience, and Johnson did not. Because the emergency room was "a very crucial area to manage," Jackson's "little bit more experience" gave her the edge. Fields "had been managing the Ambulatory Surgery and Observation area for a long time" and "had a lot of interaction with the speciality clinics . . . . and had a very good understanding about the specialty clinics activity." Morales also believed that both Jackson and Fields had demonstrated better leadership abilities and interpersonal skills than Johnson.

Prior to the reorganization, Johnson was a Nurse III, Step 11. After the reorganization, Johnson was placed under Jackson's supervision as a Staff Nurse, which was a Nurse III, Step 9 and involved fewer responsibilities. Later, Johnson was reassigned and is currently a Nurse III, Step 12.

Johnson filed this action, alleging that BVAMC discriminated and retaliated against her when it failed to select her for one of the newly-created Nurse Manager positions and instead transferred her to a Staff Nurse position and retaliated against her when it removed certain overtime pay from her bank account.[8] The district

_____

[8] In the district court, Johnson also alleged that BVAMC retaliated against her by changing and delaying her performance evaluation. Johnson makes only two passing references

7

court granted BVAMC's motion for summary judgment, concluding that Johnson had failed to present sufficient evidence that BVAMC's articulated reasons for its actions were pretext.

## II. DISCUSSION

On appeal, Johnson argues that the district court erred in granting summary judgment because she presented sufficient evidence of pretext. We disagree and address each employment action in turn.

A.     Re-structured Nurse Manager Positions

Johnson initially contends that she presented direct evidence of Morales' discriminatory bias and points to Morales' comment that Orientals do not look people in the eye when they talk to them. Morales' comment does not constitute direct evidence.

Direct evidence is evidence that, if believed, proves the existence of a fact without inference. Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641-42 (11th Cir. 1998). In the Title VII context, for a statement to be direct evidence, it must reflect "a discriminatory or retaliatory attitude correlating to the

in her appeal brief to the delayed and changed performance evaluation, but does not challenge on appeal the district court's grant of summary judgment on this claim. Therefore, we do not address this claim. See Access Now, Inc., v. Southwest Airlines, Co., 385 F.3d 1324, 1330 (11th Cir. 2004) (stating that an appellant must clearly and specifically identify issues on appeal in the brief).

8

discrimination or retaliation complained of by the employee." Id. (quotation marks and citation omitted). In other words, to be direct evidence, the remark must indicate that the employment decision in question was motivated by an impermissible factor. Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1358-59 (11th Cir. 1999). Morales' comment was made months before the panel interviews and hiring decisions for the new Nurse Manager positions and did not relate to the decision not to select Johnson for one of those positions. See, e.g., Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002) (holding that decisionmaker's comment made before and not directly related to plaintiff's termination was not direct evidence of discrimination).

Johnson alternatively contends that she presented evidence that Morales' reasons for not selecting her for one of the new Nurse Manager positions were pretextual.[9] Morales offered several reasons for his decision, including Johnson's lower interview scores, her lack of an advanced degree and her lesser experience in

---

[9] Because Johnson attempts to prove her claims through circumstantial evidence, we evaluate her claims using the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). With regard to Johnson's discrimination claims, the parties do not dispute that Johnson established her prima facie case and that BVAMC articulated legitimate, non-discriminatory reasons for its employment decisions. However, with regard to Johnson's retaliation claims, BVAMC argues on appeal that Johnson did not make out a prima facie case because she failed to show she suffered an adverse employment action. The district court assumed Johnson had suffered an adverse employment action, but concluded that BVAMC was entitled to summary judgment because Johnson failed to show that BVAMC's reasons for its actions were pretext. Because we affirm the district court's pretext ruling, we need not address BVAMC's argument that Johnson did not suffer an adverse employment action.

particular areas of ambulatory care. Johnson's evidence does not rebut any of these reasons.

A plaintiff may overcome the employer's asserted legitimate reasons and avoid summary judgment "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Taylor v. Runyon, 175 F.3d 861, 867 (11th Cir. 1999) (quotation marks and citation omitted). To establish pretext, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [each of those reasons] unworthy of credence." Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004), cert. denied, No. 05-88 (U.S. Oct. 17, 2005); see also Chapman v. AI Transport, 229 F.3d 1012,1024-25 (11th Cir. 2000) (en banc). In doing so, the plaintiff "must meet [the proffered legitimate] reason head on and rebut it, and the employee cannot succeed simply by quarreling with the wisdom of that reason." Chapman, 220 F.3d at 1030 (citation omitted).

With regard to Johnson's lack of a Master's degree, Johnson presented evidence that in the past Morales had placed people who did not have Master's degrees in Nurse Manager positions. However, Johnson did not provide the

10

contextual information needed to make evidence of these hiring decisions meaningful for purposes of her pretext claim. See Lee v. GTE Fla., Inc., 226 F.3d 1249, 1255 n.2 (11th Cir. 2000) (rejecting as meaningless plaintiff's evidence that decisionmaker had promoted only four women into management and only two women into staff positions because plaintiff provided no "specific context against which to measure these brief facts"). For example, Morales testified that sometimes the person with the Bachelor's degree has different skill levels and background, which would affect his decision. Johnson did not present evidence of the duties or type of Nurse Manager positions that were filled with someone without a Master's degree or when these positions were filled. Without more information, this evidence does not call into question Morales' claim that Johnson's lack of a Master's degree was a factor in his decision not to select her for the two particular new, combined Nurse Manager positions.

With regard to Johnson's lower interview scores, she complains that they were subjective and highly suspect in light of Morales' dramatically lower score for Johnson and his past derogatory comment about Orientals not making eye contact. However, subjective evaluations, including interviews, are permissible bases for making a selection or non-selection, so long as the defendant's explanation of its reasons are clear and reasonably specific. Chapman, 229 F.3d at

11

1033-34.[10]  Here, a panel of three consistently gave Johnson the lowest score of the three applicants, and Johnson agreed that the other two panel members were free of bias.  Furthermore, Morales consistently graded the hardest of the three panelists.

Johnson also contends she presented evidence from which a jury could infer that Morales had already made up his mind to eliminate Johnson months before the panel interviews.  Specifically, Johnson points to the following: (1) Johnson's office being moved; (2) her loss of duties; (3) her being passed over for appointments as Acting NCMS and Call Center Supervisor; and (4) Morales' decision to eliminate two rather than one Nurse Manager position after McCree decided to retire early.  None of this evidence demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable factfinder could conclude that BVAMC's proffered reasons were unworthy of belief.  See Cooper, 390 F.3d at 725.

Johnson also points to certain organizational charts, but these charts were presented as drafts for discussion, with possible mistakes and omissions.  Notably, the only organization chart in the record has one employee's name crossed out and another employee's name handwritten in the margin.  It also omits mention of

---

[10] Johnson does not argue that Morales failed to give clear and reasonably specific reasons for his interview scores.  Moreover, Morales explained that he gave Johnson low scores because she did not stay focused on the questions when she gave her answers, instead going off on tangents, and therefore did not give the answers Morales was looking for.

Morales, Moore and Fields. Furthermore, there is no evidence that Morales prepared or helped prepare these particular charts.

In addition, it is undisputed that Morales played no role in the selection of the Acting NCMS and that the decision to relocate Johnson's office due to construction was made by a construction committee of which Morales was only one member. Although Johnson began to lose some of her duties in March 1998, by this time the restructuring of the nursing units had begun.

Johnson's claim that Morales changed the number of Nurse Manager positions to be eliminated from one to two when he realized McCree was going to retire is not supported by the record. First, the record does not establish that Morales initially decided to eliminate only one position and then changed his mind. Moore, not Morales, asked the Nurse Managers to brainstorm solutions if one position was eliminated. Furthermore, Johnson testified that Morales was not present at this brainstorming meeting in which McCree announced her decision to retire early, and Johnson presented no other evidence that Morales was aware of McCree's early retirement when he announced a couple of weeks later that two Nurse Manager positions would be eliminated.

Johnson emphasizes that she had more overall nursing experience and more years of management experience than either of the other candidates. She points out

13

that she interviewed, hired and trained one of the successful candidates ten years before. These arguments do not address head on the reasons for Morales' decision. Morales testified that seniority was not a factor in his decision and that the three candidates were comparable in their nursing and management experience. Rather, in making his decision, Morales focused on the particular areas of Ambulatory Care in which each candidate had experience, something Johnson's evidence does not address. By arguing that she has more nursing and nurse management experience than the other candidates, Johnson is merely quarreling with the wisdom of Morales' decision, which is insufficient to establish pretext.[11]

B.    Deduction of Overtime Pay

Johnson contends that she presented sufficient evidence that Morales' reason for removing her overtime pay was pretext. Johnson's evidence of pretext is based on two theories: (1) she did the work and therefore should have been paid, and (2) the BVAMC director had approved the overtime in a general e-mail directing all services to pay overtime to employees to review medical records to confirm insurance. Johnson's evidence does not address, much less refute, Morales' pre-

---

[11] Furthermore, any disparities between the candidates' experience either in general or in the specific areas of ambulatory care are not "so glaring that no reasonable impartial person could have chosen the candidate selected for the promotion in question over the plaintiff." See Vessels, 408 F.3d at 772; see also Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1090 (11th Cir. 2004) (holding that the disparity in qualifications must be "so apparent as virtually to jump off the page and slap you in the face").

14

approval policy. See Chapman, 229 F.3d at 1030. It is undisputed that Morales had this pre-approval policy and that Johnson did not get his pre-approval. Thus, there is no showing of pretext in Morales' withdrawal of overtime pay from Johnson's account because he required supervisors to obtain his personal approval before working overtime.

## III. CONCLUSION

The district court properly granted summary judgment because Johnson failed to present sufficient evidence that BVAMC's articulated reasons for deducting her overtime pay and for not selecting her for one of the new, reorganized managerial position were pretext.

**AFFIRMED**.